Keith Beauchamp (012434)
D. Andrew Gaona (028414)
COPPERSMITH BROCKELMAN PLC
2800 N. Central Avenue, Suite 1900
Phoenix, AZ 85004
Telephone: (602) 381-5488
kbeauchamp@cblawyers.com
agaona@cblawyers.com

Gillian Gillers*
Norma Ventura*
James M. Knoepp*
SOUTHERN POVERTY LAW CENTER
P.O. Box 1287
Decatur, GA 30031
Telephone: (404) 521-6700
gillian.gillers@splcenter.org
norma.ventura@splcenter.org
jim.knoepp@splcenter.org

Matthew J. Schlesinger*
Jason A. Carey*
Terra White Fulham*
Patrick Lee*
COVINGTON & BURLING LLP
One City Center, 850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-5581
mschlesinger@cov.com
jcarey@cov.com
tfulham@cov.com
plee@cov.com

[Additional Counsel Listed on Signature Page]

[*Pro hac vice application forthcoming]

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| E.S.M. on his own behalf and on behalf of his minor child, H.S.S., <br><br>            Plaintiffs, <br><br>       v. <br><br> United States of America, <br><br>            Defendant. | No. <br><br> **COMPLAINT** |

# INTRODUCTION

1. This action seeks damages for an asylum-seeking family forcibly separated by the United States government: E.S.M. and his son, H.S.S.[1]

2. When federal agents came to take Héctor from his father Eliot, Héctor was just eleven years old. Héctor cried and told his father he feared they would never be reunited. Eliot was forced to watch, helplessly, as his son was led away to an unknown fate. It would be two months before they would see each other again.

3. The United States government tore Eliot and Héctor apart pursuant to a cruel and unconstitutional policy: The government intended to inflict terror and harm on them as a means of deterring others from seeking to enter the United States.

4. Héctor and Eliot fled persecution in their home country, only to find it in the very place they sought refuge—the United States of America.

5. Starting in 2017, the United States government tore thousands of young children away from their parents. The children and their parents were not told when—or even if—they would ever see each other again. The children were sent to facilities and foster homes hundreds or thousands of miles away from their parents, and in many cases were subject to abuse and neglect while in the custody of the United States government. Many families were separated for months or years.

6. Although the full number of separations is yet unknown, it is estimated that the U.S. government has separated more than 5,000 children from their parents at the southern border since 2017.

7. During the separations, government officers inflicted additional trauma by refusing to inform parents and children of each other's whereabouts or well-being, failing to facilitate communication between separated parents and children, and failing to implement a tracking system to ensure families could be reunited.

---

[1] For ease of reference and to protect Plaintiffs' identities, E.S.M. will be referenced hereafter by the pseudonym Eliot, and H.S.S. by the pseudonym Héctor. Plaintiffs will file a separate motion to proceed with pseudonyms.

8.     The government did not allow children and their parents to communicate in any way for weeks or months.  Parents did not know where their children were, or even if they were safe—and had no way to comfort or protect them.  Children were terrified and could not understand what had happened to them or why it happened.  Why had their parents abandoned them to strangers?

9.     The government's policy of forcibly taking children from their parents caused extraordinary trauma to thousands of families, including Plaintiffs—a father and his child who were separated for months after being detained at the U.S.-Mexico border in Arizona in May 2018.

10.     After Héctor was taken away from his father, they remained separated, with Héctor in the custody of strangers, for approximately two months.

11.     Despite Eliot's desperate pleas for information, the government did not provide information to Eliot about Héctor's safety or location.  Eliot only learned of his son's location by speaking to his brother.  Once he was able to establish contact with Héctor, they had few opportunities to communicate.  Eliot was able to talk to Héctor only about once a week for approximately ten minutes each call, nearly all of which were at Eliot's expense.

12.     The government understood the harm that it was inflicting on Eliot and Héctor.  Indeed, it took children from their parents and kept them apart not despite the harm, but because of it:  The government intended to use the terror inflicted on Eliot and Héctor, as well as other families that sought asylum in the United States, to deter other families from migrating to the United States.

13.     Eliot and Héctor suffered, and continue to suffer, physical, mental, and emotional harm because of the intentional, reckless, and negligent acts of U.S. government policymakers at the highest levels, whose goal was to inflict harm and instill terror.  Eliot and Héctor suffered, and continue to suffer, further harm because of the intentional, reckless, and negligent acts and omissions of federal actors who used

unreasonable force and cruelty to separate Eliot and his son and failed to reunify them for months.

14.     Even after reunification, the effects of the government's inhumane conduct continue to exact a toll on Eliot and Héctor. Children, especially those young and vulnerable like Héctor, suffer trauma when they are separated from their parents, even temporarily. Such childhood trauma harms cognitive development and emotional growth and increases the risk of disease and mental health disorders.

15.     As a result of the separation, Héctor has been diagnosed with Post-Traumatic Stress Disorder, with dissociative subtype. He has flashbacks and nightmares related to the separation and lives in fear that he could be separated from his father again.

16.     Eliot also suffered emotional trauma as a result of the separation—as would any parent who is deprived of any ability to protect his child, and later learns that his child has suffered and lives with continued pain. Eliot has been diagnosed with Post-Traumatic Stress Disorder and mild depression. Due to the separation, he feels down, depressed, and hopeless, and has experienced intrusive memories related to the separation.

17.     As a result of Defendant's actions, the Plaintiffs now face an increased risk of developing additional mental health disorders, including severe anxiety, severe depression and suicidal ideation.

18.     A report by the U.S. Department of Health and Human Services ("HHS") Office of the Inspector General ("OIG") issued in September 2019 found that "intense trauma" was "common" among children who entered the Office of Refugee Resettlement ("ORR") facilities in 2018, with children who had been "unexpectedly separated from a parent" facing additional trauma.[2] According to this report, "separated children exhibited

---

[2] Off. of Inspector Gen., U.S. Dep't Of Health & Human Servs., OEI-09-18-00431, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody*, at 9 (Sept. 2019), https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf [https://perma.cc/2RPJ-WM5H] [hereinafter HHS OIG Report II].

more fear, feelings of abandonment, and post-traumatic stress than did children who were not separated. Separated children experienced heightened feelings of anxiety and loss as a result of their unexpected separation from their parents . . . ."[3] Some children suffered from "acute grief that caused them to cry inconsolably," "believed their parents had abandoned them," experienced "feelings of fear or guilt," and were "concerned for their parents' welfare."[4]

19. Eliot and Héctor will endure the trauma of forcible separation for the rest of their lives. Eliot seeks redress for himself and on behalf of Héctor for the harm the United States has inflicted. The government is liable for this conduct under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671, *et seq*. ("FTCA").

20. Eliot and Héctor, by this action, seek monetary damages for the extensive injuries they suffered because of the conduct of the United States government—conduct that should not be tolerated by any civilized society.

**JURISDICTION AND VENUE**

21. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1346(b), and the FTCA, 28 U.S.C. §§ 2671–2680.

22. On August 28, 2019, Eliot, on his behalf and on behalf of Héctor, submitted an administrative claim to the U.S. Department of Justice ("DOJ"), the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and HHS. None of the agencies has made a final disposition of Eliot's administrative claim, and, as six months have passed since submission of the claim, it is deemed finally denied. 28 U.S.C. § 2675(a). Accordingly, Eliot and Héctor have exhausted all available administrative remedies.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1402(b) because the acts and omissions that give rise to this action took place in this District.

---

[3] *Id.* at 10.

[4] *Id.*

**THE PARTIES**

24.     Plaintiffs Héctor and Eliot are Guatemalan nationals who currently reside in New York.  Eliot brings this action on behalf of himself and his minor child, Héctor, age fourteen.  In 2018, Eliot fled to the United States with Héctor, seeking asylum.  Upon arrival in the United States, Eliot and Héctor, then eleven years old, were forcibly separated for two months by government officers.  Héctor was placed in ORR custody at a facility in Mesa, Arizona, while Eliot was detained by ICE in Arizona, Georgia and Texas.  Eliot and Héctor are currently seeking asylum in the United States.

25.     Defendant is the United States of America, acting through individuals in the White House, the White House Office, DHS, HHS, and DOJ—"federal agencies" of the United States under 28 U.S.C. § 2671—and their employees, officers, and agents, including but not limited to CBP and ICE, subcomponent agencies of DHS that are under the direction, authority, and control of the Secretary of Homeland Security; ORR, a subcomponent agency of HHS that is under the direction, authority, and control of the Secretary of Health and Human Services; and the Office of the Attorney General within the DOJ.

26.     The federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with the federal agencies listed above.

27.     DHS employees were responsible for separating Eliot from his son, including failing to reunify them after Eliot's brief court appearance.  DHS employees were also responsible for supervising and managing detained individuals at CBP and ICE facilities, including those located in Arizona, Georgia and Texas where Eliot was detained during the course of his separation from Héctor.

28.     HHS employees are responsible for supervising and managing the detention of children the government classifies as unaccompanied, including at the facility in Arizona where Héctor was detained while separated from his father.

29.     High-ranking officials from the White House Office, DHS, HHS, and DOJ worked together to design and implement the unlawful and unconstitutional family separation policy, pursuant to which Eliot and Héctor were subject to significant harm.

30.     At all relevant times, all DHS employees referenced in this Complaint who interacted with Plaintiffs were acting as investigative or law enforcement officers. 28 U.S.C. § 2680(h).

## STATEMENT OF FACTS

**A.     The United States Developed and Implemented the Inhumane Separation Policy for the Improper Purpose of Deterring Future Asylum Seekers**

31.     The United States government took thousands of children from their parents and kept them apart, intending to cause terror, anguish, and harm.  It deliberately used cruelty in an attempt to deter future migrants from seeking asylum in the United States, violating the Constitution, statutory and common law, and basic human decency.

**1.     Beginning in Early 2017, the United States Began Planning a Family Separation Policy with Knowledge of and Intent to Cause Harm**

32.     Beginning in February 2017, DHS officials began considering a policy of separating parents and children arriving at the U.S.-Mexico border as a means of deterring the arrival of asylum seekers at this border.  On March 3, 2017, press reports showed that DHS had been considering this policy, which DHS acknowledged in a statement explaining that "the Department of Homeland Security continually explores options that may discourage those from even beginning the journey" north from Central America to the U.S. border.[5]

---

[5] Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border*, Reuters (Mar. 3, 2017), https://www.reuters.com/article/us-usa-immigration-children/exclusive-trump-administration-considering-separating-women-children-at-mexico-border-idUSKBN16A2ES [https://perma.cc/P7DE-HX5A].

33.     The United States government *knew*—long before it instituted the family separation policy to which Plaintiffs were ultimately subjected—of the harm it would cause by separating children from their parents.  For example, in 2016, the DHS Advisory Committee on Family Residential Centers concluded that "the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children," and that "[f]amily separation in these circumstances raises serious concerns and violates the best interests of the child—which requires prioritizing family integrity and the maintenance of emotional ties and relationships among family members."[6] As a result, when encountering families migrating to the United States, DHS did not separate a child from an accompanying adult except in very limited circumstances, such as where CBP determined that the adult was not the child's parent or guardian, or the adult posed a danger to the child.[7]

34.     Nonetheless, in February 2017, a meeting of high-ranking federal officials from ORR, DOJ, CBP and ICE took place at the office of the CBP Commissioner, and a proposal to routinely separate asylum-seeking parents from their children at the border was discussed.[8]  Commander Jonathan White, then Deputy Director of ORR's

---

[6] U.S. Immigr. & Customs Enf't, Dep't of Homeland Sec., *Rep. of the DHS Advisory Committee on Family Residential Centers*, at 2, 10 (Sept. 30, 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf [https://perma.cc/TZ9C-CUMC].

[7] *See, e.g.*, Off. of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-18-84, *Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy*, at 3 (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf [https://perma.cc/4E35-DQR5] [hereinafter DHS OIG Report I].

[8] H.R. Subcomm. on Oversight and Investigations, Comm. on Energy and Com., *Hearing Unofficial Transcript*, at 1006–1024, 1131–1138 (Feb. 7, 2019), https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/HIF038.020%20-%20OI%20-%20Hrg%20-%202019%20Feb%2007%20-%20UNEDITED.pdf [https://perma.cc/F2EV-ZS9W] (testimony of Commander Jonathan White, U.S. Pub. Health Serv. Commissioned Corps, U.S. Dep't of Health and Human Servs.).

Unaccompanied Children program who attended the meeting, later expressed his concerns about the harms of family separation directly to then-ORR director Scott Lloyd and other top officials.[9]  Commander White has testified before Congress that because "'[s]eparating children poses significant risk of traumatic psychological injury to the child,' . . . neither he nor anyone he worked with 'would ever have supported such a policy.'"[10]

35.    The publication of the March 3, 2017 news reports that DHS was considering a deterrence policy of separating migrant parents and children at the border was immediately met with an outcry of warnings from the medical community.  The American Academy of Pediatrics ("AAP"), among others, warned that such a policy would affect "vulnerable, scared children" and urged policymakers to "exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents or other relatives and caregivers."[11]

36.    Nonetheless, the Secretary of Homeland Security, John Kelly, confirmed that DHS was considering this policy "in order to deter more movement" along the route north from Central America taken by many asylum seekers.[12]

_____

[9] *Id.*

[10] Colleen Long, *Official Who Oversaw Migrant Kids: Separation Causes Trauma*, AP News (Feb. 7, 2019), https://apnews.com/99591d8bc3b043e2af6fa9207e328ae6 [https://perma.cc/BQ3T-U6RJ] (quoting testimony of Commander Jonathan White, U.S. Pub. Health Serv. Commissioned Corps.).

[11] Fernando Stein & Karen Remley, Am. Acad. of Pediatrics, *AAP Statement Opposing Separation of Mothers and Children at the Border* (Mar. 4, 2017), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/immigrantmotherschildrenseparation.aspx [https://perma.cc/AZ5Q-TN38].

[12] Daniella Diaz, *Kelly: DHS Is Considering Separating Undocumented Children from their Parents at the Border*, CNN (Mar. 7, 2017), https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/index.html [https://perma.cc/L4Q9-KVAW].

37.     When confronted by the growing backlash to the then-proposed family separation policy, Secretary Kelly soon appeared to change course, assuring the Senate Committee on Homeland Security and Governmental Affairs in April 2017 that children would be separated from their parents only "if the child's life is in danger" or if the parent was "an addict,"[13] rather than as a matter of course for families arriving at or crossing the border.

38.     The comments of President Donald Trump's Administration and the government's response to the many public warnings of the dire effects of a family separation policy show that the Trump Administration was well aware of the harms family separation would cause before it implemented its family separation policy.

39.     In response to the concerns raised by Commander White that a family separation policy would "expose children to unnecessary risk of harm," and "exceed the capacity of the [ORR Unaccompanied Alien Children, or UAC] program," White was repeatedly assured by the then-Director of ORR, among others, that "there was no policy that would result in the separation of children and parents," and that, accordingly, the UAC program need not plan for continued increases in children classified as unaccompanied as a result of being separated from their parents.[14]

---

[13] Brooke Singman, *Kelly Says Full-Scale Border Wall 'Unlikely,' Clarifies Position on Family Detentions*, Fox News (Apr. 5, 2017), https://www.foxnews.com/politics/kelly-says-full-scale-border-wall-unlikely-clarifies-position-on-family-detentions [https://perma.cc/RAE5-7N85].

[14] H.R. Subcomm. on Oversight and Investigations, Comm. on Energy and Comm., *Hearing Unofficial Transcript*, at 1012–1024, 1114–1118, 1131–1138, 2058–2064 (Feb. 7, 2019), https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/HIF038.020%20-%20OI%20-%20Hrg%20-%202019%20Feb%2007%20-%20UNEDITED.pdf [https://perma.cc/F2EV-ZS9W] (testimony of Commander Jonathan White, U.S. Pub. Health Serv. Commissioned Corps, U.S. Dep't of Health and Human Servs.).

### 2. After Piloting Family Separation in 2017, the United States Launches a Full-Scale Policy of Separating Parents from Their Minor Children in April 2018

40. Despite Secretary Kelly's public assurance to Congress in April 2017 that families crossing the border would be separated only in specific circumstances for the welfare of the child, the government covertly began instituting a policy of routine separation of families who crossed the southern border. It did so knowing the separations would cause harm and intending to leverage that harm to deter future immigrants from seeking to enter the United States.

41. Between July and November 2017, a pilot program of family separation began in CBP's El Paso sector ("El Paso Initiative").[15] Under the program, the government ostensibly sought to prioritize the prosecution of the misdemeanor charge of improper entry, including the prosecution of parents who crossed the border into the United States with young children. The government detained parents and forcibly took their children away. DHS re-classified the children as unaccompanied minors and placed them in the custody of ORR.[16] The government did not reunify the parents following the completion of any misdemeanor criminal sentence. CBP separated nearly 280 families during the El Paso Initiative.[17]

---

[15] Off. of Inspector Gen., U.S. Dep't of Health & Human Servs., OEI-BL-18-00511, *Separated Children Placed In Office of Refugee Resettlement Care*, at 3 (Jan. 17, 2019), https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf [https://perma.cc/2XX7-GBYR] [hereinafter HHS OIG Report I] ("From July through November 2017, the El Paso sector of Customs and Border Protection (CBP), an agency within DHS, implemented new policies that resulted in 281 individuals in families being separated.").

[16] *See, e.g.*, *United States v. Dominguez-Portillo*, No. 17-MJ-4409, 2018 WL 315759, at *1 (W.D. Tex. Jan. 5, 2018), *aff'd sub nom. United States v. Vasquez-Hernandez*, 314 F. Supp. 3d 744 (W.D. Tex. 2018), *aff'd*, 924 F.3d 164 (5th Cir. 2019).

[17] Off. of Inspector Gen., U.S. Dep't Of Homeland Sec., OEI-09-18-00431, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families*, at 14 (Nov. 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf [https://perma.cc/GY3G-F8TG] [hereinafter DHS OIG Report II].

42.     In describing the El Paso Initiative, a Border Patrol official explained: "Although it is always a difficult decision to separate these families, it is the hope that this separation will act as a deterrent to parents bringing their children into the harsh circumstances that are present when trying to enter the United States illegally."[18]

43.     During the El Paso Initiative, judges, prosecutors, and advocates expressed concern that young children were being separated from their parents, and that separated parents and children were given no information about each other's whereabouts and well-being.[19]

44.     Because the unaccompanied minors who typically arrived at ORR prior to 2017 had arrived at the border genuinely unaccompanied by a parent or guardian, ORR did not have any formal means of noting that children artificially classified as unaccompanied by CBP in fact had parents in DHS custody, nor of tracking the whereabouts of those parents.  As a result, some staff began to informally track such relationships upon learning of them during a child's intake interview.[20]

45.     By late 2017, the government was separating families in targeted parts of the U.S.-Mexico border, including families arriving through official ports of entry. Notwithstanding the alarm bells raised by ORR that it lacked the systems needed to handle the steady increase in children who had been separated from their parents and re-

---

[18] Off. of Inspector Gen., U.S. Dep't of Justice, 21-028, *Review of the Department of Justice's Planning and Implementation of its Zero Tolerance Policy and its Coordination with the Department of Homeland Security and Health and Human Services*, 14 n.30, https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf [https://perma.cc/RUJ6-KCML] [hereinafter, DOJ OIG Report].

[19] DOJ OIG Report, *supra* note 18, at 15-16; DHS OIG Report II, *supra* note 17, at 24; *see, e.g.*, *infra* ¶ 154 and notes 79-80.

[20] HHS OIG Report I, *supra* note 15, at 6.

classified as unaccompanied, ORR was discouraged from taking steps to formalize and better prepare for future increases.[21]

46.     In December 2017, senior DOJ and DHS officials jointly prepared and reviewed a memorandum titled "Policy Options to Respond to Border Surge of Illegal Immigration," containing sixteen proposals.[22]  The first proposal, titled "Increase Prosecution of Family Unit Parents," suggests action to "[i]nstruct CBP and ICE to work with DOJ to significantly increase the prosecution of family unit parents when they are encountered at the border," noting that "[t]he parents would be prosecuted for illegal entry (misdemeanor) or illegal reentry (felony) and the minors present with them would be placed in HHS custody as UACs."[23]

47.     The memorandum's second proposal, titled "Separate Family Units," suggests "[a]nnounc[ing] that DHS is considering separating family units, placing the adults in adult detention, and placing the minors under the age of 18 in the custody of HHS as unaccompanied alien children (UACs)," and concludes, "[o]nce legal

---

[21] *See* H.R. Subcomm. on Oversight and Investigations, Comm. on Energy and Com., *Hearing Unofficial Transcript*, at 1012–1024; 1131–1138; 2058–2064 (Feb. 7, 2019), https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/HIF038.020%20-%20OI%20-%20Hrg%20-%202019%20Feb%2007%20-%20UNEDITED.pdf [https://perma.cc/F2EV-ZS9W] (testimony of Commander Jonathan White, U.S. Pub. Health Serv. Commissioned Corps, U.S. Dep't of Health and Human Services).

[22] Julia Ainsley, *Trump Admin Weighed Targeting Migrant Families, Speeding Up Deportation of Children*, NBC News (Jan. 17, 2019), https://www.nbcnews.com/politics/immigration/trump-admin-weighed-targeting-migrant-families-speeding-deportation-children-n958811 [https://perma.cc/QN8H-TPD8] Memorandum available at: https://perma.cc/JS9B-GZWJ [hereinafter Joint Memorandum]; *see also* Anne Flaherty & Quinn Owen, *Leaked Memo Shows Trump Administration Weighed Separating Families at Border, Sen. Merkley Wants Nielsen Investigated for Perjury*, ABC News (Jan. 18, 2019), https://abcnews.go.com/Politics/leaked-memo-shows-trump-administration-weighed-separating-families/story?id=60459972 [https://perma.cc/6SVC-9Q3D]; DOJ OIG Report, *supra* note 18, at 11–12.

[23] Joint Memorandum, *supra* note 22, at 1.

coordination between DHS, HHS, and DOJ is complete, begin separating family units, as stated above."[24]

48. Despite the concerns raised by prosecutors, judges and other stakeholders about the implementation of the El Paso Initiative, on April 6, 2018, the U.S. Attorney General announced a "Zero Tolerance Policy," "referencing the [El Paso] Initiative as a basis for expanding referrals of family unit adults throughout the Southwest border," while turning a blind eye to "the challenges encountered during the El Paso Initiative, including the government's inability to reunify separated families."[25]

49. On May 4, 2018, citing "recent presidential direction and guidance from the Attorney General," the DHS Secretary signed a memorandum directing Border Patrol sectors to "refer for prosecution all adults apprehended for crossing the border illegally," expressly including parents who entered the United States with their children.[26]

50. In early May 2018, CBP estimated to the Office of Management and Budget ("OMB") that it would separate more than 26,000 children from May through September 2018 because of the Zero Tolerance Policy.[27]

51. Intending the separations to inflict harm and serve a deterrent effect, the United States government put no mechanism in place to reunify separated families following completion of the parent's criminal sentence.[28]

52. On or around May 11, 2018, the acting U.S. Attorney for the District of Arizona, Elizabeth Strange, expressed concern that family members prosecuted in her

---

[24] *Id.*

[25] DOJ OIG Report, *supra* note 18, at 22, 31–32.

[26] *Id.* at 32.

[27] DHS OIG Report II, *supra* note 17, at 17–18.

[28] *See id.* at 14 n.30; *Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1140–41 (S.D. Cal. 2018) ("[T]here was no procedure in place for the reunification of these families.").

district were not being reunited with their children immediately after the parents received time-served sentences.[29]

53.    In May and June 2018, federal judges, advocates, and other stakeholders along the U.S.-Mexico border expressed concerns about the government's failure to track and reunify children and parents whom they had separated, or to keep separated parents and children informed of each other's whereabouts and wellbeing.[30]  These concerns were elevated to the White House and headquarters of DOJ, DHS, and HHS.[31] Nevertheless, the failures to track and reunify families continued.

54.    Several aspects of the Zero Tolerance Policy and officials' comments on it confirm that the policy's goal was to harm families through forcible and prolonged separation in an effort to deter future immigrants from seeking entry to the United States, and that prosecution of underlying criminal offenses of improper entry was pretextual.

55.    For example, the December 2017 joint DOJ and DHS memorandum noted that the "[p]rosecution of [f]amily [u]nits" and "separat[ion] [of] family units" "would be reported by media and . . . have substantial deterrent effect" on future migration.[32]

56.    On or around May 11, 2018, U.S. Attorneys along the border with Mexico communicated to high-level DOJ officials that they were "deeply concerned" about the welfare of children who were separated from their parents, including issues relating to the tracking and reunification of separated families.[33]  In a meeting with the U.S. Attorneys that same day, Attorney General Jeff Sessions explained: "We need to take away

---

[29] DOJ OIG Report, *supra* note 18, at 39.

[30] H.R. Judiciary Comm., *The Trump Administration's Family Separation Policy: Trauma, Destruction, and Chaos*, at 15–16, App'x AP, App'x AQ (Oct. 2020), https://judiciary.house.gov/uploadedfiles/the_trump_administration_family_separation_policy_trauma_destruction_and_chaos.pdf?utm_campaign=4526-519 [https://perma.cc/B727-PVXK]; DOJ OIG Report, *supra* note 18, at 43–46.

[31] DOJ OIG Report, *supra* note 18, at 44.

[32] Joint Memorandum, *supra* note 22, at 1; *see also* Flaherty & Owen, *supra* note 22.

[33] *Id.* at 38.

children." He stated that if migrants cared about their children, then migrants should not bring their children to the United States.[34]

57.    On May 11, 2018, John Kelly, President Trump's then-Chief of Staff, stated on National Public Radio that "a big name of the game is deterrence . . . . It could be a tough deterrent — would be a tough deterrent."[35] He added, "[t]he children will be taken care of — put into foster care *or whatever*."[36]

58.    On June 19, 2018, Steve Wagner, Assistant Secretary of HHS said, "[w]e expect that the new policy will result in a deterrence effect . . . ."[37]

59.    According to officials involved in planning the Zero Tolerance Policy, President Donald Trump's senior adviser Stephen Miller "saw the separation of families not as an unfortunate byproduct but as a tool to deter more immigration," and "with the support of [Attorney General] Sessions, advocated for separating all immigrant families, even those going through civil court proceedings."[38]

60.    The United States government's separation of families was pursuant to a family separation policy, as evidenced by its separation of many families who presented

---

[34] *Id.* at 39.

[35] *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR (May 11, 2018), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr [https://perma.cc/ZN5N-VN5R].

[36] *Id.* (emphasis added).

[37] Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, Wash. Post (June 19, 2018), https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/ [https://perma.cc/LTB8-878Y].

[38] Julia Ainsley and Jacob Soboroff, *Trump Cabinet officials voted in 2018 White House meeting to separate migrant children, say officials*, NBC News (Aug. 20, 2020), https://www.nbcnews.com/politics/immigration/trump-cabinet-officials-voted-2018-white-house-meeting-separate-migrant-n1237416 [https://perma.cc/3WWZ-8G2U].

at official ports of entry seeking asylum and were not subject to prosecution.[39]  The government also separated families who crossed the border between ports of entry when the parents were not criminally charged.  These practices were consistent with talking points drafted for Attorney General Jeff Sessions for use at a White House meeting on May 3, 2018, which explained that "DHS should consider . . . *administrative* separation of family units," even where the parent is not referred for prosecution.[40]

61.     When the government prosecuted parents for misdemeanor improper entry, most parents received minimal or no jail time.[41]  The government could have reunified parents with their children following the completion of the parent's misdemeanor sentence.[42]  Instead, the government sent their children to far-flung ORR facilities,

---

[39] *See Ms. L. v. U.S. Immigr.& Customs Enf't*, 310 F. Supp. 3d 1133, 1143 (S.D. Cal. 2018) ("[T]he practice of family separation was occurring before the zero tolerance policy was announced, and that practice has resulted in the casual, if not deliberate, separation of families that lawfully present at the port of entry, not just those who cross into the country illegally."); Off. of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-20-35, *CBP Separated More Asylum-Seeking Families at Ports of Entry than Reported and for Reasons Other than Those Outlined in Public Statements*, OIG-20-35 (May 29, 2020), https://www.oig.dhs.gov/sites/default/files/assets/2020-06/OIG-20-35-May20.pdf [https://perma.cc/R52B-KUSH] [hereinafter DHS OIG Report III].

[40] DOJ OIG Report, *supra* note 18, at 30–31.

[41] DHS OIG Report II, *supra* note 17, at 33 ("Approximately 82 percent of all parents separated from children during Zero Tolerance received minimal or no jail time.").

[42]  *See id.* ("Because adults in CBP custody are normally referred for prosecution within 48 hours, adults could have court hearings, be sentenced, and return to CBP facilities before their children were transferred to ORR. Despite Border Patrol's awareness of increasing numbers of parents receiving time-served sentences, separations continued."); DHS OIG Report I, *supra* note 7, at 15 ("CBP may have been able to avoid separating some families. In McAllen, Texas, many adults prosecuted under the Zero Tolerance Policy were sentenced to time served and promptly returned to CBP custody. Several officers at CBP's Central Processing Center in McAllen stated that if these individuals' children were still at the facility when they returned from court, CBP would cancel the child's transfer to HHS and reunite the family. However, CBP officials later arranged to have adults transferred directly from court to ICE custody, rather than readmitting them where they might be reunited with their children.").

sometimes thousands of miles away, and needlessly prolonged separations, usually for months and sometimes even for years.[43]

62.    Although the government claimed that it applied the "Zero Tolerance" prosecutions evenhandedly, CBP targeted parents arriving with their children over single adults when making criminal referrals to DOJ.[44]

63.    During six weeks at the height of the Zero Tolerance period, between May 7, 2018 and June 20, 2018, the government separated at least 2,231 children from their parents.[45]

64.    In response to intense public backlash against the policy, on June 20, 2018, President Trump issued an executive order purporting to end the policy of family separation.  Exec. Order No. 13841, *Affording Congress an Opportunity to Address Family Separations* (Fed. Reg. at 83 FR 29,435, June 25, 2018).

65.    A DHS directive, issued on June 23, 2018, suggested that once families were separated, only parents who were subject to removal would be reunited with their

---

[43] DOJ OIG Report, *supra* note 18, at 53 ("[W]ith additional efforts to coordinate prior to the implementation of the zero tolerance policy, it may have been technically and logistically possible in some cases for the prosecution of family unit adults to occur without a prolonged separation of the children from the defendant-parent . . . . However, we found that, even when prosecution occurred within a brief timeframe and defendant-parents received time-served sentences, children were most often transferred from DHS to HHS custody and over 1,900 lengthy separations resulted."); Staff of H.R. Comm. on Oversight & Reform, *Child Separations by the Trump Administration*, at 17 (Jul. 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-07-2019.%20Immigrant%20Child%20Separations-%20Staff%20Report.pdf [https://perma.cc/ZE5H-9FJZ] [hereinafter House Oversight Report] (noting that "[s]eparated children were in ORR custody for an average of approximately 90 days," and that some separated children were held in ORR custody for far longer, citing separations lasting more than a year and a half).

[44] *See* TRAC Immigr., *Syracuse University, "Zero Tolerance" at the Border: Rhetoric vs. Reality* (July 24, 2018), https://trac.syr.edu/immigration/reports/520/ [https://perma.cc/EK2Q-CJ7G].

[45] H.R. Oversight Report, *supra* note 43, at 29.

children, and only "for the purposes of removal."[46]  This directive imposed an impossible choice on parents:  They had to choose between seeing their children again or continuing to seek asylum in the United States.  The Trump Administration would not allow them to do both.

66.  On June 26, 2018, Judge Sabraw of the U.S. District Court for the Southern District of California issued a preliminary injunction prohibiting the government from separating parents from their children absent a finding of parental unfitness or danger to the child.  He ordered the government to reunify children under age five within fourteen days and children age five and older with their parents within thirty days of the order.[47]

67.  The President of the United States Donald Trump continued to openly discuss the deterrence rationale for pursuing the family separation policy well after the Zero Tolerance aspect of the policy was officially ended, declaring in December 2018 that "[I]f you don't separate, FAR more people will come."[48]

---

[46] *Fact Sheet: Zero-Tolerance Prosecution and Family Reunification*, U.S. Dep't of Homeland Sec. (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification [https://perma.cc/4X33-8C8D].

[47] *Ms. L.*, 310 F. Supp. 3d at 1146, 1149.

[48] *See* Donald J. Trump (@realDonaldTrump), Twitter (Dec. 16, 2018, 8:25 AM), https://twitter.com/realdonaldtrump/status/1074339834351759363 [https://perma.cc/4EMP-JC34]; *see also* Fox News, *Interview: Maria Bartiromo Interviews Donald Trump on Fox Sunday Morning Futures - April 28, 2019*, YouTube, at 1:32–2:21 (Apr. 28, 2019), https://www.youtube.com/watch?v=hvUc7ONNTp4 [https://perma.cc/8SQ9-8K6H]; Kimberly Kindy, Nick Miroff & Maria Sacchetti, *Trump Says Ending Family Separation Practice Was a 'Disaster' That Led to Surge in Border Crossings*, Wash. Post (Apr. 28, 2019), https://www.washingtonpost.com/politics/trump-says-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-border-crossings/2019/04/28/73e9da14-69c8-11e9-a66d-a82d3f3d96d5_story.html [https://perma.cc/FXL6-C84J].

### B.    The United States Forcibly Separated Eliot and Héctor

#### 1.    Eliot and Héctor Seek Asylum in the United States and Are Taken into CBP Custody

68.    In early May 2018, Eliot and Héctor fled their home in Guatemala, where Eliot and his family had received death threats, to seek refuge in the United States.  They reached the U.S. border near Lukeville, Arizona on May 19, 2018.

69.    On May 19, 2018, immigration officers apprehended Eliot and Héctor and transported them to a CBP facility about two hours away.  Upon information and belief, that facility was the Ajo Border Patrol Station.

70.    Eliot and Héctor were detained in a cell known as a hielera ("icebox") due to its frigid temperatures.  The cell was approximately 15 feet by 20 feet and was crowded with approximately 30 adults and children.  The cell contained cement benches, but no beds.  Héctor's warm outerwear was taken from him.  They were given thin foil sheets, which were inadequate to shield them from the bitter cold.  Eliot and Héctor slept on the floor of the cell, which was packed with other people.  The lights were always on.

71.    The bathrooms accessible to Eliot, Héctor, and the other detainees did not have doors. No shower rooms were available, and the people detained in the hielera had not bathed for days.  Eliot and Héctor were given no hygiene products.

72.    The only source of drinking water was the sink used for washing hands.  The water smelled like chlorine.  Officers gave Eliot and Héctor only cold burritos to eat.  Héctor was very hungry.

#### 2.    The United States Takes Héctor from Eliot

73.    In the CBP facility, an officer questioned Eliot.  Eliot showed the officer his identification and Héctor's birth certificate.

74.    At approximately 2 p.m. on the second day of Eliot and Héctor's detention, May 20, 2018, officers announced to the people detained in their cell—including Eliot and Héctor—that the children were going to be taken to a different location away from their parents.

75. Rumors swept through the room that the children were being taken away forever. Eliot felt scared that he could be deported without Héctor. Other families in the cell began to cry and panic.

76. Héctor, who was then 11 years-old, told his father that he did not want to be separated from him. Eliot and Héctor began to cry. Eliot tried to comfort his son by telling him that the separation would only be for a short time.

77. The officers instructed Eliot and the other parents to pack up their children's belongings. In that moment, Eliot realized that the officers were going to separate him from his son. He began panicking. He felt his heart rate increase with fear. Héctor began crying even harder.

78. An officer returned Eliot's backpack that had been taken when he was apprehended, which contained Héctor's belongings—mostly clothes and shoes. The officer instructed Eliot to transfer Héctor's belongings into a plastic bag. Other parents also gathered their children's belongings and said goodbye. Children and adults cried, and children begged their parents not to let the officials take them away.

79. An officer then instructed Eliot to walk Héctor towards a door of the detention facility. Officers told Eliot and the other parents that the children needed to board a bus outside the detention center. There were bars on the windows of the bus, which increased Eliot's despair.

80. Eliot hugged his son tightly as they both cried. Héctor did not want to let his father go. He told Eliot he feared that they would never be reunited. Eliot attempted to comfort Héctor by telling him that he would never leave him behind.

81. Then Eliot had no choice but to let Héctor board the bus along with the other crying children.

82. An officer grabbed Héctor by the hand and led him to the bus. Eliot watched in pain as his son boarded the bus with the other children. Eliot felt scared at the thought that his son was alone. Héctor was taken from Eliot around 3 p.m. on May 20, 2018.

83.     Upon information and belief, Eliot and Héctor were separated without any intention to reunify them or any plan for their reunification, even though government officials knew that most people like Eliot who were convicted of misdemeanor improper entry were sentenced to time served.

### 3.     Eliot Is Kept in Detention While Separated from Héctor and Has Limited Contact with His Son

84.     Eliot and the other parents were taken back to the cells, where no children remained. Eliot continued to cry. He asked officers where Héctor had been taken, but the officers would not answer.

85.     After a few hours, officers shackled Eliot and other adults by their wrists and ankles and took them to a different hielera, about one or two hours away. Eliot again asked officers where Héctor was, but the officers did not give him any information.

86.     The second hielera was packed with people, including the bathrooms, where some people were trying to lie down. Eliot remained standing for long stretches of time because there was so little space to sit down. He spent the night at this hielera but could not sleep.

87.     The next day, May 21, 2018, Eliot was taken with a group of other separated parents to a court. He was charged with misdemeanor improper entry to the United States. Eliot's appointed lawyer explained that if he pleaded guilty, he would be sentenced to time served. Eliot pleaded guilty and received a sentence of time served. Through his appointed lawyer, Eliot begged the judge to be reunited with his son. The federal magistrate judge's Minutes for Eliot's case state "The Court recommends upon release the defendant be reunited with his child: [Héctor], YOB 2006, who entered the United States with the defendant." The minutes of the court hearing indicate that it concluded on May 21, 2018, at 3:15 p.m.

88.     Rather than being reunited with Héctor who was still in DHS custody and had not yet been transferred to an ORR facility,[49] Eliot was instead taken from the court to another DHS-run hielera several hours away.  Approximately 24 hours had passed since Héctor had been separated from Eliot. Nonetheless, Héctor was transferred from DHS custody to ORR custody the next day, on May 22, 2018—just 48 hours after he had been separated from his father.

89.     Eliot was in DHS custody throughout the duration of his separation from Héctor, with the possible exception of his brief appearance in federal court.  When served with requests under the Freedom of Information Act, the U.S. Marshals Service and Bureau of Prisons found no records reflecting that Eliot was ever in the custody of either of these agencies.

90.     Upon information and belief, the government attorney who prosecuted Eliot was an attorney for DHS—not DOJ—who had been deputized to carry out the prosecution.[50]

91.     Government officials never made a determination that Eliot was unfit or presented a danger to Héctor.

92.     At the second hielera, Eliot asked officers about Héctor, but the officers insisted that they knew nothing.  Eliot was distraught.  He could barely eat and hardly slept.

93.     On or about May 25, 2018, Eliot was shackled at his wrists and ankles and brought to the ICE Florence Staging Facility detention center in Florence, Arizona.

---

[49]  *See* DHS OIG Report I, *supra* note 7, at 15 (noting that if a parent was sentenced to time served and returned to DHS custody, DHS could have cancelled the child's transfer to HHS and avoided separating the family).

[50]  DOJ OIG Report, *supra* note 18, at 75 ("Participating USAOs agreed to prosecute these cases, and in some jurisdictions the U.S. Department of Homeland Security (DHS) also provided the USAOs with Customs and Border Protection (CBP) prosecutors, deputized as Special Assistant U.S. Attorneys, and carried out the prosecutions.").

94.    At the Florence detention center, another detainee gave him money to deposit into his commissary account, which he used to call his wife in Guatemala. Eliot's wife had spoken with Héctor on the phone and told Eliot that their son was in a "shelter." This call was the first time Eliot received news of his son since their separation.

95.    Eliot felt distressed. He had no idea if Héctor was eating well or sleeping, and whether he was being cared for or mistreated.

96.    After being detained for a few days at the Florence facility, Eliot was shackled and transported to the Stewart Detention Center in Lumpkin, Georgia ("Stewart"). Eliot arrived at Stewart on or about May 28, 2018.

97.    Up to this point, the government still had not provided Eliot with any contact information for Héctor or any information related to his whereabouts. When Eliot asked immigration officers where Héctor was and if he could talk to Héctor, officers told him that they did not know where Héctor was and that they could not get in touch with him. Instead, Eliot's brother tracked down the telephone number for Héctor's case manager at Southwest Key Las Palmas, the ORR facility in Mesa, Arizona where Héctor was being held, and provided it to Eliot.

98.    On or about June 4, 2018, after about two weeks of separation, Eliot was finally able to talk with Héctor for the first time. Using money that his brother had deposited in his account to make a call from ICE detention, he called the shelter where Héctor was staying in Mesa, Arizona.

99.    During their first call, Héctor cried, and they were only able to speak for a few minutes. With tears in his eyes, Eliot did his best to remain strong for his son.

100.    After the first call, Eliot and Héctor spoke only approximately once per week during the two-month separation. Each call lasted only about ten minutes. Héctor did not say much on these calls, and Eliot could not get a good sense of how his son was doing. On several occasions, Eliot was unable to reach anyone at the shelter when he called.

101.    While at Stewart, Eliot was interviewed by an asylum officer who found Eliot had a credible fear of returning to Guatemala.

102.    On or about June 30, 2018, after approximately one month at Stewart, Eliot was moved to an ICE detention center in Folkston, Georgia.

103.    At the Folkston detention center, officials required Eliot to undergo a DNA test, which Eliot found confusing and upsetting given that he had provided government officials with a copy of Héctor's birth certificate when they were apprehended.  He still had no idea when, or even if, he would be reunified with Héctor.

104.    On June 26, 2018, Judge Sabraw issued the preliminary injunction in the *Ms. L.* case and ordered the government to reunite the families like Eliot and Héctor within thirty days.[51]

105.    Eliot and the other detained men began to see stories on the news about family separation and a judge's order that the government had to reunify families separated at the border, but no one from the government gave Eliot or the other separated fathers any information about the judge's orders or the whereabouts or welfare of their children.

106.    On or about July 17, 2018, Eliot was transferred to Port Isabel Detention Center in Los Fresnos, Texas.

### 4.    Héctor Is Placed in ORR Custody Away from His Father

107.    Government records indicate that on May 22, 2018, at 3:26 p.m., Héctor was admitted to the Southwest Key Las Palmas facility ("Southwest Key"), a private contractor for ORR in Mesa, Arizona.  Héctor's admission to Southwest Key occurred a full 24 hours after Eliot had been sentenced to "time served" during his court proceedings on May 21, 2018, when the court stated that Eliot should be reunited with his son. Southwest Key is located approximately 130 miles from the CBP station where Eliot and Héctor were separated.

---

[51] *Ms. L.*, 310 F. Supp. 3d at 1149.

108. ORR records indicate that during a counseling session on May 23, 2018, Héctor "displayed feelings of sadness regarding his separation from his father while in ICE custody."

109. ORR records from May 23, 2018, indicate Héctor's wish to speak to family and although he was able to speak to his mother on or about May 23, 2018, he was unable to speak to his father until June 4, 2018, approximately two weeks after their separation. ORR records indicate that Héctor was "very happy to hear from [his] father."

110. On June 28, 2018, a Southwest Key staff member reported that another minor in the facility punched Héctor in the face. According to the ORR report, the other minor "threw" milk on the dining table where he and Héctor were both sitting. When Héctor asked the other minor to clean up the milk, the other minor became upset. After a verbal exchange the other minor stood up and struck Héctor in the face with his fist.

111. On July 4, 2018, Héctor reported to a Southwest Key staff member that another minor threatened him after Héctor told him to follow direction provided by staff. Héctor asked the other minor to stop popping balloons as the Southwest Key staff had directed. In response, the other minor told him, "leave here, before you die," and made a hand gesture to Héctor.

112. At a counseling session on July 4, 2018, records indicate that Héctor "expressed that he was feeling unmotivated throughout the week owing to the fact that he misses his father (who is currently in ICE custody)."

113. On July 18, 2018, records indicate that Héctor was "tearful" and "sad" during a counseling session and noted that he missed his mother in Guatemala.

### 5. Héctor and Eliot Are Reunited but Continue to Suffer the Effects of Separation

114. When Eliot was transferred to ICE's Port Isabel Detention Center, he still did not know what was going to happen—if he was going to be deported back to Guatemala or reunited with his son.

115.    After his arrival at the Port Isabel Detention Center on or about Tuesday, July 17, 2018, Eliot was told that he would be reunited with Héctor, and that it would happen that Thursday.  But Thursday came and went, and still Eliot had not seen his son.

116.    On or around Friday, July 20, 2018, Eliot waited for Héctor as the other separated parents were called out one by one to be reunified with their children.  Eliot started to feel desperate.

117.    Finally, an officer walked him from his cell to a waiting area at the detention center.  Héctor was standing there with a social worker.  There were no other children around because Héctor was the last in his group to be taken to his parent.

118.    Eliot and Héctor saw each other at the same moment.  They ran to each other, embraced, and then both started crying.  It had been two months since they had seen each other.

119.    Eliot felt tremendous relief, but also extreme sadness about what the separation had done to his son.  Héctor told his father that he thought he was never going to come for him, tinging their reunion with sorrow as Eliot understood the anguish his son had gone through.

120.    From the Port Isabel Detention Center, Eliot and Héctor traveled together to New York City to attempt to rebuild their lives together.  As they traveled to New York, Héctor asked his father many questions about Eliot's time in detention: if he had been able to sleep well, if the food they gave him was good, and how he spent his time in detention.

121.    After Eliot and Héctor were reunited, Eliot noticed that Héctor had changed.  Héctor was afraid to be alone and worried every time Eliot left the house.  Héctor was also more distant.  Whereas before the separation he was talkative, he was now notably quiet.

122.    As a result of the separation, Héctor has been diagnosed with Post-Traumatic Stress Disorder, with dissociative subtype.  He has expressed feeling fear, sadness, and nervousness when anything triggers a memory of being separated from

Eliot, or at hearing about separation in the news.  He has experienced flashbacks 1-2 times per week and has nightmares or bad dreams 1-2 times per week related to the separation.  Due to the separation, Héctor has behaved in a withdrawn and sometimes detached manner.  He often becomes fearful and preoccupied with getting back to his father any time they are separated for even a brief period of time, and he lives in fear that the separation from his father could happen again at any time.  When asked about the separation, Héctor becomes painfully overwhelmed; he sobs and is unable to continue speaking.

123.    Eliot feels that he has been psychologically damaged by his forced separation from Héctor and that it has left him traumatized.  During the time he was apart from Héctor, he constantly worried about what was happening to his son.  Not being with Héctor—and not knowing what he was going through—was very difficult for Eliot, and his head was constantly filled with anxiety about what could possibly be happening to his son.

124.    As a result of the separation, Eliot has been diagnosed with Post-Traumatic Stress Disorder and mild depression.  He has experienced appetite disturbance and feels tired and has low energy.  Due to the separation, he has felt down, depressed, and hopeless.  He feels as though he has let Héctor down, has difficulty concentrating, and has a decreased ability to experience joy.  Eliot has also experienced intrusive memories related to having to pack Héctor's bag of clothes when they were forcibly separated and related to his first call with Héctor following their separation.  Eliot struggles with the fear that his son will be taken from him again.

## C.    The Government's Forcible Separation of Parents and Children Caused Irreparable Harm

125.    Forcible parent-child separations have long been known to cause significant short- and long-term damage to mental, physical, and emotional health.

126.    Keeping parents separated from their children with "little or no direct access to basic information about their health or general well-being, *plainly causes*

*irreparable harm*."[52]  Children attach to their caregiver from the time they are born, and the children's sense of safety "depends on that relationship."[53]  Disrupting that relationship causes "the parts of the brain that deal with attachment and fear" to "develop differently."[54]  It is not surprising, then, that "[s]eparation irreparably harms [families] every minute it persists."[55]

127.    The American Academy of Pediatrics explained the effects of separation on children: "[H]ighly stressful experiences, like family separation, can . . . disrupt[]a child's brain architecture and affect[] his or her short- and long-term health. This type of prolonged exposure to serious stress—known as toxic stress—can carry lifelong consequences for children."[56]  Children who experience trauma like forced separation from a parent "are at a much greater risk of developing mental health disorders such as depression, anxiety, addiction, ADHD and PTSD. Their physical health is also negatively affected."[57]  The materials cited here barely scratch the surface of the wealth of expert

---

[52] *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 502 (D.D.C. 2018) (emphasis added).

[53] William Wan, *What Separation from Parents Does to Children: 'The Effect is Catastrophic,'* Wash. Post (Jun. 18, 2018), https://www.washingtonpost.com/national/health-science/what-separation-from-parents-does-to-children-the-effect-is-catastrophic/2018/06/18/c00c30ec-732c-11e8-805c-4b67019fcfe4_story.html [https://perma.cc/7MA6-X7MB].

[54] *Id.*

[55] *Jacinto-Castanon de Nolasco,* 319 F. Supp. 3d at 503.

[56] *Id.* (quoting Colleen Kraft, Am. Acad. of Pediatrics, *AAP Statement Opposing Separation of Children and Parents at the Border* (May 8, 2018); *see also* Allison Abrams, LCSW-R, *Damage of Separating Families: The Psychological Effects on Children*, Psychol. Today (Jun. 22, 2018), https://www.psychologytoday.com/us/blog/nurturing-self-compassion/201806/damage-separating-families [https://perma.cc/H967-BBWV] (Because a child's "secure attachment comes from the child's perceptions of his or her caregiver's availability (physical accessibility) . . . separations as brief as one week in duration could negatively impact the quality of attachments.").

[57] Abrams, *supra* note 56.

material describing the harms caused by family separation.  Given the extensive evidence, the irreparable harm caused by forcibly separating parents and children is indisputable.

128.    All of these circumstances show that the government intentionally inflicted the severe harm caused by forcible and prolonged separation on families, like Plaintiffs, who crossed the U.S. border.  The government did so to deter future immigrants from coming to the United States.

D.    **The Government's Policy of Forcible Separation Was Unconstitutional and Illegal**

129.    In addition to the harm it caused, the separation policy intentionally violated the constitutional rights of those separated, including the right to family integrity and to equal protection.

130.    For decades, this nation's highest court has recognized the fundamental right to family integrity protected by the Constitution:  "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."[58] These constitutional protections extend to citizens and non-citizens alike, even when confined by the government.[59]

131.    Through its family separation policy, in the name of deterrence, the United States government tore immigrant children from their parents and failed to reunify them after the parents were returned to immigration custody following completion of their criminal sentence.  Instead, the United States government placed children and parents in facilities thousands of miles apart, refused to inform parents and children of each other's whereabouts or well-being, refused to provide adequate means for parents and children to

---

[58] *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).

[59] *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 500 ("The fact that [families are] lawfully detained in immigration custody does not eliminate [their] due process right to family integrity.").

talk with each other, and failed to have any system for tracking the children or ensuring that families could be reunited.

132. As Judge Sabraw concluded in *Ms. L. v. U.S. Immigration and Customs Enforcement*, the government's actions "shock[] the conscience."[60] "[N]othing in federal law suggests that deterring immigration by indefinitely separating families once the parents have been transferred to immigration custody is a compelling or legitimate government objective."[61]

133. The United States' family separation policy was also motivated by discriminatory animus against arriving Latino immigrants of Central American origin, such as the Plaintiffs, who were targeted for deprivation of their fundamental right to family integrity.

134. The United States' discriminatory purpose is evidenced by the pretextual nature of the stated justification for separating only those families (the vast majority of whom are Latino and Central American) arriving at the southern United States border, the unusual sequence of events leading to the promulgation of the policy, and contemporaneous statements by policymakers showing a marked animus toward Latino immigrants from Central America.[62]

---

[60] *Ms. L.,* 310 F. Supp. 3d at 1144 ("[T]he practice of separating these families was implemented without any effective system or procedure for (1) tracking the children after they were separated from their parents, (2) enabling communication between the parents and their children after separation, and (3) reuniting the parents and children after the parents are returned to immigration custody following completion of their criminal sentence . . . . Certainly, that cannot satisfy the requirements of due process."); *Ms. L. v. U.S. Immigr.& Customs Enf't*, 302 F. Supp. 3d 1149, 1164 (S.D. Cal. 2018) (holding that plaintiff stated a due process claim based on the continued separation from her child after she served a sentence for misdemeanor violation of 8 U.S.C. § 1325 and was returned to DHS custody).

[61] *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 502.

[62] *See, e.g.*, Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-

(continued…)

135.    The family separation policy disproportionately impacted individuals from Central America: more than 95 percent of the members in the *Ms. L.* certified class are from Central American countries.

136.    As with the fundamental right to family integrity, the constitutional right to equal protection under the law, and to freedom from invidious discrimination by the government on the basis of race or national origin has also long been recognized as "extend[ing] to anyone, citizen or stranger, who is subject to the laws of a State," even those not lawfully present.[63]

**E.    The United States Applied the Already Cruel Separation Policy in a Deliberately Inhumane Manner to Further Harm Families**

137.    Defendant multiplied the harm it intended to cause Plaintiffs and others subject to its family separation policy by implementing the policy with intentional carelessness and callous disregard for their physical safety and emotional well-being.

138.    The Attorney General announced the Zero Tolerance Policy without any prior notice to certain DHS and HHS (including ORR) officials,[64] purposely giving those

---

meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html [https://perma.cc/2HP4-PFYK] (including El Salvador as a "shithole" country from which  immigration to the United States should not be welcomed, and expressing a preference for immigrants "from countries such as Norway"); Donald J. Trump (@realDonaldTrump), Twitter (Jun. 19, 2018, 6:52 AM), https://twitter.com/realdonaldtrump/status/1009071403918864385 [https://perma.cc/MLC6-8VX5] (characterizing "illegal immigrants" as "pour[ing] into and infest[ing] our Country").

[63] *Plyler v. Doe*, 457 U.S. 202, 215 (1982) (emphasis omitted).

[64] U.S. Gov't Accountability Off., GAO-19-163, *Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border*, at 12 (Oct. 2018), https://www.gao.gov/assets/700/694918.pdf [https://perma.cc/X2TB-VHQZ] [hereinafter GAO Report] ("DHS and HHS officials told us that the agencies did not take specific planning steps because they did not have advance notice of the Attorney General's April 2018 memo.").

employees no time to plan for or coordinate implementation.[65] The Attorney General also failed to coordinate with or seek input from the Southwest border U.S. Attorneys, the U.S. Marshals Service, or the federal courts prior to implementation of the Zero Tolerance Policy.[66]

139.   ORR was aware as of at least November 2017 of an increase in the number of children in ORR custody separated from their parents, many of whom were very young children.[67]  Yet the government failed to adequately prepare for the increased number of children separated from parents in its custody.

140.   Among other things, this deliberate lack of planning resulted in the government failing to provide adequate detention facilities, failing to track separated families, failing to communicate with parents about their children's welfare, and failing to take basic care to comply with child welfare standards, all of which compounded the harms already inflicted on families who had been forcibly separated.

## 1. Defendant Subjected Plaintiffs to Dangerous Detention Facilities Unsuited for Families with Children

141.   As a direct result of the indiscriminate and reckless apprehension, under the pretext of intending to prosecute thousands of families like Plaintiffs seeking entry into the United States,[68] the CBP-run hieleras in which Plaintiffs were initially detained were

---

[65] Commander Jonathan White, then Deputy Director of ORR's Unaccompanied Children program,  testified before Congress that ORR considered planning for the increase but was specifically told not to.  *Id.*

[66] *Id.* at 69.

[67] *See id.* at 12-13; DHS OIG Report I, *supra* note 7, at 15.

[68] The U.S. government has separated more than 5,000 families at the southern border since 2017.  Joint Status Report at 1, 12, *Ms. L. v. U.S. Immigr. and Customs Enf't*, No. 18-cv-00428 DMS MDD (S.D. Cal. Nov. 6, 2019), ECF No. 495 (the government acknowledged that, for the original class, as many as 2,814 children were separated from their parents and has thus far recognized an additional 1,556 children as part of the expanded class); ECF 439-1 (Pls.' Mem. in Support of Mot. to Enf. Prelim. Inj.), at 7 (noting that government reported 911 child separations between June 26, 2018 and June

(continued…)

dangerously overcrowded and in egregious violation of federal health and safety requirements.

142. Defendant failed to provide Plaintiffs with access to safe and sanitary restrooms, and failed to provide proper food and clean drinking water, proper clothing, bedding, hygiene products, and appropriate meals.

143. Defendant detained Plaintiffs in conditions that were so overcrowded—with adults and children alike—that detainees did not have enough room to sit or lie down to rest. The overcrowding, lack of mattress and blankets, and constant lighting in the hieleras deprived Plaintiffs of sleep.

144. Defendant placed Plaintiffs in freezing cold cages and deprived Plaintiffs of warmth by taking away their clothing and belongings.

145. In subjecting Plaintiff Héctor to inhumane and unsafe conditions in CBP detention, Defendant violated federal law and policy requiring that minors who are detained by CBP or other DHS agencies be held in "facilities that are safe and sanitary," and that account "for the particular vulnerability of minors."[69] Defendant violated requirements that minors detained by CBP be provided access to toilets, adequate temperature control and ventilation, drinking water and food.[70]

---

29, 2019, after the preliminary injunction was entered); *see also* HHS OIG Report I, *supra* note 15, at 11.

[69] *Flores v. Reno*, Stipulated Settlement Agreement ¶ 12.A, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997), https://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf [https://perma.cc/N5ZG-TPLZ]; *see also* U.S. Customs & Border Prot., *U.S. Border Patrol Policy: Hold Rooms and Short Term Custody* (Jun. 2, 2008), https://nomoredeaths.org/wp-content/uploads/2014/10/Hold-Rooms-Short-Term-Custody-Policy.pdf [https://perma.cc/4BKT-9VSW]; *see also Flores v. Barr*, 934 F.3d 910, 915–916 (9th Cir. 2019).

[70] *Flores v. Reno*, Stipulated Settlement Agreement ¶ 12.A, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997), https://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf [https://perma.cc/N5ZG-TPLZ]; *see also Flores v. Barr*, 934 F.3d 910, 916 (9th Cir. 2019).

### 2. Defendant Failed to Track Parent and Child Relationships and to Communicate with Parents About Children's Whereabouts and Safety

146. Despite the fact that tracking separated children was as simple as adding a checkbox to an ORR/DHS referral page,[71] these two agencies primarily responsible for implementing the policy instituted no "consistent way to indicate in their data systems children and parents separated at the border" until at least the summer of 2018.[72]

147. The El Paso Initiative that was implemented from July through November 2017 revealed that DHS was woefully underprepared to track separated families through its information technology systems. CBP personnel "relied on local spreadsheets to document family separations," which led to data errors and "prevented ICE and CBP personnel in other locations from seeing where El Paso Sector Border Patrol agents had separated family members."[73]

148. El Paso sector CBP officials raised concerns to CBP headquarters about the lack of functionality to track family separations in their computer systems but headquarters failed to make any changes in response to those concerns.[74]

149. The U.S. government thus was on notice at least as of November 2017 that government databases could not properly track families once the child was separated from the parent. It was also aware that DHS component agencies needed to better coordinate with each other and with ORR before a vast expansion of family separation across the length of the southern border. But the government plowed ahead with its

---

[71] *Oversight of the Trump Administration's Family Separation Policy: Hearing Before the H. Comm. on the Judiciary*, at 4 (Feb. 26, 2019) (statement of Scott Lloyd, Senior Advisor, Center for Faith and Opportunity Initiatives, U.S. Dep't of Health and Human Servs.), https://docs.house.gov/meetings/JU/JU00/20190226/108872/HHRG-116-JU00-Wstate-LloydS-20190226.pdf [https://perma.cc/P97Q-JB58].

[72] GAO Report, *supra* note 64, *Highlights: What GAO Found*; *see also id.*

[73] DHS OIG Report II, *supra* note 17, at 15.

[74] *Id.* at 14–15.

policy of mass family separation despite these identified defects and without making any improvements to its IT systems.

150. When the government ramped up family separations during the Zero Tolerance Policy, these deficiencies were predictably multiplied on a mass scale, and with devastating results.

151. CBP entered inaccurate and incomplete information in its systems, including failing to link parents and children as separated families. These initial errors had a ripple effect through other government tracking systems: ICE could not readily identify parents in its custody who were separated from their children and HHS/ORR systems lacked even a field to indicate that children had been separated from their parents until July 2018—after a federal court halted the practice of family separation and ordered reunification of children and parents.[75]

152. The most staggering result of this failure was that the United States government had no ready records of where thousands of parents' children were located, and could not promptly reunite parents and children,[76] even when ordered to do so by a federal judge.[77]

---

[75] *Id.* at 13–14, 21.

[76] *Id.* at 9–11; *see* Kevin Sieff, *The Chaotic Effort to Reunite Immigrant Parents with their Separated Kids*, Wash. Post (June 21, 2018), https://www.washingtonpost.com/world/the_americas/the-chaotic-effort-to-reunite-immigrant-parents-with-their-separated-kids/2018/06/21/325cceb2-7563-11e8-bda1-18e53a448a14_story.html?noredirect=on&utm_term=.f985c57b8cad [https://perma.cc/HQ6W-HLBK]; Miriam Jordan, *Torn Apart by Zero Tolerance, Kept Apart by Red Tape*, N.Y. Times (June 24, 2018), https://www.nytimes.com/2018/06/24/us/family-separation-brazil.html [https://perma.cc/EY2J-XYPT].

[77] *See* Evan Halper, *Federal Investigators Find Many Failures in Trump's Family Separation Policy*, L.A. Times (Oct. 2, 2018), https://www.latimes.com/politics/la-na-pol-immigrants-oig-report-20181002-story.html [https://perma.cc/ZP4B-HQVE]. These circumstances led the court to conclude that the "unfortunate reality" of the family separation policy was that "migrant children [were] not accounted for with the same

(continued…)

153.    After separation, parents and children often did not know each other's whereabouts for weeks or months, as was the case with Plaintiffs.  When the children were taken, "officers often failed to fully explain to parents what was happening and how the adults could get in touch with their kids."[78]

154.    The government failed to provide parents with any "paperwork" documenting the location or well-being of their children, or to enable communication between parents and their separated children.[79]  One Texas federal district court magistrate judge observed in January 2018, when addressing the government's failure to track families separated during the 2017 pilot of the family separation policy, that "[t]he practical effect" of this failure was "to create a 'blackout' period where parent and child are wholly incommunicado from each other."[80]

155.    Plaintiffs here experienced the devastating effects of the government's failure to link parents' cases with those of their children and the government's failure to provide information to the parents about the children's whereabouts.

156.    The anguish of Eliot's two-months-long separation from his child was exacerbated by the government's failure to provide information about his child's whereabouts, well-being, and plan for custody.  Eliot had heard of parents who had been separated from their children for six months to a year.  He was afraid he would be separated from Héctor for that long, or worse, that he would never be reunited with his son.

---

efficiency and accuracy as *property*."  *Ms. L.*, 310 F. Supp. 3d at 1144; Joint Status Report at 7, *Ms. L. v. U.S. Immigr. and Customs Enf't*, No. 18-cv-00428 DMS MDD (S.D. Cal. Oct. 20, 2020), ECF No. 556 (noting that the parents of approximately 545 children who had been separated from their parents prior to June 26, 2018 still could not be located as of October 2020).

[78] Halper, *supra* note 77.

[79] *See United States v. Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, 2018 WL 315759, at *1 (W.D. Tex. Jan. 5, 2018); *see also id.* at *2, *9.

[80] *Id.* at *9.

157. Héctor suffered further harm from not knowing where his father was or whether he would ever see him again. Héctor was never provided an explanation for why he was at the shelter and separated from his father. He thought he was going to be separated for a long time, because he knew of other children who had been separated for a very long time.

158. Even after Eliot was finally able to obtain contact information for his child *as the result of his own effort*, phone calls were logistically difficult and expensive to make, severely limiting their communication.[81]

159. With respect to the Plaintiffs, Defendant violated federal law and policy requiring children held in ORR custody be provided with "contact with family members."[82]

**CONSEQUENCES OF DEFENDANT'S WRONGFUL ACTS**

160. The federal government deliberately violated Plaintiffs' constitutional rights, including their right to family integrity, and failed in its basic duties to not harm those in its custody.

161. The government's actions and failures were designed to and did cause Plaintiffs severe trauma and emotional distress.

162. The government knew that subjecting Plaintiffs to prolonged separation would fill them with terror, desperation, and anguish.

163. The government purposefully inflicted that trauma on Plaintiffs to instill fear in others. The government then compounded that trauma by keeping Plaintiffs apart

---

[81] *See* Halper, *supra* note 77; Jordan, *supra* note 76; Jack Herrera, *A New Report Reveals How Family Separation Led Border Officials to Break the Law*, Pacific Standard (Oct. 4, 2018), https://psmag.com/news/a-new-report-reveals-how-family-separation-led-border-officials-to-break-the-law [https://perma.cc/9BGJ-LT8Q].

[82] *Flores v. Lynch*, 828 F.3d 898, 903 (9th Cir. 2016) (citing *Flores v. Reno*, Stipulated Settlement Agreement, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997), at ¶ 21); *see also* ORR Policy Guide § 3.3.10, https://www.acf.hhs.gov/orr/policy-guidance/children-entering-united-states-unaccompanied-section-3#3.3.10 [https://perma.cc/MUF9-L2XJ].

for two months, without telling them anything about the other's whereabouts or well-being, without allowing them even to speak to one another for two weeks following their separation, and without any plan for reuniting them.

164.    Plaintiffs will carry the harm done to them for the rest of their lives.  The government's conduct here is unconscionable, and it cannot be excused in a civilized society.

**CLAIMS FOR RELIEF**

**COUNT ONE**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

165.    Plaintiffs re-allege each allegation in the preceding paragraphs 1 through 164 as though fully set forth here.

166.    Defendant, federal officials, and federal employees referenced above engaged in extreme and outrageous conduct with an intent to cause, or at least a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

167.    Defendant, federal officials, and federal employees referenced above intended to cause, and did cause, Plaintiffs to suffer severe emotional distress by forcibly subjecting Eliot and Héctor to prolonged separation from each other without their consent and despite the obvious terror caused by the separation.

168.    Defendant, federal officials, and federal employees referenced above intended to cause, and did cause, Plaintiffs to suffer severe emotional distress by causing the separation of Eliot and Héctor while both were being held in immigration custody, and failing to reunify Eliot and Héctor following Eliot's sentence to time served.

169.    Defendant, federal officials, and federal employees referenced above intended to cause, and did cause, Plaintiffs to suffer severe emotional distress by, *inter alia*, failing to develop and use a system for tracking the existence of the parent-child relationship, withholding from Eliot any information about his child's location or welfare for weeks, not allowing Eliot and Héctor to communicate with each other or severely

limiting such opportunities, and not giving any indication that Eliot and Héctor would ever be reunited.

170. Defendant, federal officials, and federal employees referenced above further intended to cause, and did cause, Plaintiffs to suffer severe emotional distress by subjecting Plaintiffs to inhumane detention conditions prior to their separation.

171. Defendant, federal officials, and federal employees referenced above confirmed their intent to cause severe emotional distress by failing to plan for or secure resources to accommodate the increase in children designated as UACs as a result of the family separation policy, failing to provide a child welfare or child safety justification for forcibly separating children from their parents, failing to track families, failing to account for all the children separated from their parents, and failing to craft any type of reunification plan until receiving a court order from a federal judge.

172. The behavior of Defendant, federal officials, and federal employees referenced above was extreme and outrageous under the circumstances.

173. As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress throughout their time in Defendant's custody and continue to suffer the lasting effects of that distress today.

174. Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

**COUNT TWO**

**NEGLIGENCE**

175. Plaintiffs re-allege each allegation in the preceding paragraphs 1 through 174 as though fully set forth here.

176. Defendant, federal officials, and federal employees referenced above had a legal duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs. They also had mandatory, non-discretionary duties including but not limited to, those imposed by the United States Constitution, the *Flores* consent decree, federal statute, and federal regulations.

177. Defendant, federal officials, and federal employees referenced above acted unreasonably by violating their duties while Plaintiffs were in Defendant's custody.

178. Defendant, federal officials, and federal employees referenced above violated those duties by *inter alia* forcibly subjecting Plaintiffs to prolonged separation without their consent.

179. Defendant, federal officials, and federal employees referenced above violated those duties by *inter alia* causing the separation of Eliot and Héctor while both were being held in immigration custody and failing to reunify Eliot and Héctor following Eliot's sentence to time served.

180. Defendant, federal officials, and federal employees referenced above violated those duties by *inter alia* failing to develop and use a system for tracking the existence of the parent-child relationship, withholding from Eliot any information about Héctor's location or welfare for weeks, severely limiting Plaintiffs' ability to communicate with each other, and not giving any indication that the Plaintiffs would ever be reunited.

181. Defendant, federal officials, and federal employees referenced above violated those duties by subjecting Plaintiffs to inhumane detention conditions prior to their separation.

182. Defendant, federal officials, and federal employees referenced above further violated those duties by failing to plan for or secure resources to accommodate the increase in children designated as UACs as a result of the family separation policy, failing to provide a child welfare or safety justification for forcibly separating children from their parents, failing to track families, failing to account for all children separated from their parents, and failing to craft any type of reunification plan until receiving a court order from a federal judge.

183. By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

184. As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

185. Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, the United States is liable to Plaintiffs for negligence.

## COUNT THREE

## LOSS OF CHILD'S CONSORTIUM

186. Plaintiffs re-allege each allegation in the preceding paragraphs 1 through 185 as though fully set forth here.

187. Héctor suffered severe, permanent, and disabling injuries.

188. Héctor must now cope with the long-term mental health effects and trauma caused by Defendant, federal officials, and federal employees referenced above.

189. Those injuries substantially interfere with the capacities of Héctor to interact with Eliot in a normal and gratifying way.

190. Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, the United States is liable to Eliot for loss of consortium.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand as follows:

A. Compensatory damages;

B. Attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

C. Such other and further relief as the Court may deem just and appropriate.

Respectfully submitted this 21st day of January, 2021.

COPPERSMITH BROCKELMAN PLC

By s/ Keith Beauchamp
    Keith Beauchamp
    D. Andrew Gaona

SOUTHERN POVERTY LAW CENTER
    Gillian Gillers*
    Norma Ventura*
    James M. Knoepp*

COVINGTON & BURLING LLP
    Matthew Schlesinger*
    Jason Carey*
    Terra White Fulham*
    Patrick Lee*

COVINGTON & BURLING LLP
    Swati R. Prakash*
    The New York Times Building
    620 Eighth Avenue
    New York, NY 10018-1405
    Telephone: (212) 841-1174
    sprakash@cov.com

*Attorneys for Plaintiffs*